IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

CHARLES E. WALTON, JR.                                                    PLAINTIFF

v.                                                    CIVIL ACTION NO. 1:22-CV-96-SA-RP

TRONOX LLC                                                                DEFENDANT

ORDER AND MEMORANDUM OPINION

On July 13, 2022, Charles E. Walton, Jr. initiated this civil action by filing his Complaint [1] against Tronox LLC. Walton filed his Amended Complaint [20] with leave of court on November 16, 2022. Now before the Court is Tronox's Motion for Summary Judgment [53]. The Motion [53] has been fully briefed and is ripe for review.

*Relevant Factual and Procedural Background*

Walton, a black male, worked at Tronox from 2016 until his termination in January 2022. Tronox manufactures titanium dioxide at its plant in Hamilton, Mississippi. Walton was an electrical engineer in the Asset Improvement Unit (sometimes hereinafter referred to as "AI Unit") at the Hamilton plant. His formal title was Senior Asset Improvement Engineer.

According to Tronox, the AI Unit "is tasked with developing mid and long-term plans and strategies for the maintenance, improvement, and replacement of plant equipment and other assets. . . . Once developed, the plans and strategies are handed off to the Reliability and Maintenance units to conduct the preventive maintenance, make repairs, and replace equipment as needed." [54] at p. 2-3. In his declaration, AI Unit Leader Byron Crowe provided the following additional information regarding the nature of the AI Unit:

> Asset Improvement Engineers juggle multiple on-going projects at any given time and are also frequently pulled away from their on-going tasks to provide engineering support in the plant. As a result, Asset Improvement Engineers have to be skilled at multi-tasking. They also must be able to effectively plan their work in order to meet

> deadlines. Because many projects involve others within Asset Improvement and from other departments, the failure to meet deadlines will cause others who are depending on timely completion of your tasks to wait and/or fail to meet their own deadlines.

[53], Ex. 3 at p. 2.

The AI Unit is one unit under the umbrella of the Technology and Improvement Department ("T&I Department"). Each unit in the T&I Department consists of engineers from different disciplines. The engineers in each unit report to the unit leader, who in turn reports to the T&I Manager. During the relevant time period, Walton, a Senior Asset Improvement Engineer, reported to Byron Crowe, the AI Leader.

The Hamilton plant also has a Human Resources ("HR") Department. At the relevant time, Talia Worth was the HR Manager.

At Tronox, employees receive mid-year and year-end performance evaluations conducted by their supervisors and overseen by HR. The evaluations are based on goals. Some goals are goals for the plant or department as a whole, while other goals are for the individual employee. Both the employee and supervisor provide a comment and a rating for each goal. The ratings range as follows, from worst to best: "below expectations," "meets expectations minus," "meet expectations," "meets expectations plus," and "above/exceeds expectations." [53], Ex. 22 at p. 11.[1] At the end of the evaluation, an overall rating is provided.

Walton alleges that his employment at Tronox was uneventful until Crowe was transferred to the AI Leader position in November 2019. Prior to that, in 2018, Walton's overall rating on his year-end performance evaluation was "meets expectations," despite the fact that he received a

---

[1] Many goals include specific "performance measures" indicating how the rating should be determined. [53], Ex. 22 at p. 3. For example, on the 2020 evaluation's Safety goal, a "below expectations" rating would be warranted if there was more than one environmental incident. Other performance measures include benchmarks measured in capital or in reference to deadlines.

"below expectations" rating on some goals. [53], Ex. 20 at p. 7. His supervisor at the time, Matt Chance, noted that he had not developed "[t]he 5-year plan for the switchgear, and the TIC4 injection FMEA was reassigned." *Id*. at p. 6. However, Chance also noted some of Walton's accomplishments, such as his "assistance with moving the transformer and the Go-Ab installation." *Id*.

In 2019, after becoming AI Leader, Crowe gave Walton an overall year-end rating of "meets expectations." [53], Ex. 21 at p. 8. Crowe noted that some goals were ahead of target, while others were behind target. Regarding the electrical standards project that Walton asserted was finished, Crowe noted that the standards were still under review and "must be expanded and completed" for use by other departments. *Id*. at p. 7. Crowe's comment summarizing Walton's performance as a whole stated:

> Charles is very willing to assist others and works toward meeting all of his assignments. He is self motivated and doesn't require constant supervision. 2020 will be a year in which the entire asset improvement team looks to improve overall project delivery by becoming more involved in projects during development to ensure standards and specifications are incorporated into all work.

*Id.*

Walton refused to sign the 2019 performance evaluation and instead submitted a rebuttal, contending that he was not a "meets expectations" engineer. [58] at p. 3. During his deposition, Walton pointed to several of his accomplishments that he felt warranted a rating above "meets expectations." He noted that the plant had "zero [electrical] downtime" in 2019, which was "[u]nheard of;" that he drafted electrical engineering standards that the plant had not had for 60 years; and that he prevented the plant from shutting down due to fear that the transformers would catch on fire. [53] at p. 64. He further stated that the goals listed in the evaluations changed mid-2019 and some of his accomplishments for the year were not accounted for. *Id.*

Crowe alleges that he "began to experience consistent problems with Walton's work performance" the following year. [53], Ex. 3 at p. 2. Crowe contends that Walton struggled with multi-tasking, planning, meeting deadlines, and submitting acceptable, quality work. He opines that Walton's struggles may have been exacerbated by a system change in 2020, whereby the Asset Improvement, Process, and Capital Projects Units began to work as a team on all capital projects. Crowe contends that he began attempting to help Walton with his performance by creating a spreadsheet called an Action Tracker, meeting with him on a bi-weekly basis, and emailing him with reminders and feedback. Crowe alleges that he involved HR Director Talia Worth in this process and documented the process in his journal, excerpts of which are attached to his declaration. *See* [53], Ex. 3 at p. 9-17.

On Walton's 2020 mid-year performance evaluation, Crowe's overall comment reads as follows:

> Currently trending [meets expectations] overall. There is a gap in understanding meeting expectations versus above expectations and Charles and I have had discussions around this. Charles did excellent work on the preheater gas skid which will result in a large capital avoidance. However, it has not been driven to completion. Charles needs to be able to manage multiple jobs with high quality at a high rate of efficiency. Improvement is being made and I look forward to working with Charles over the remainder of this year.

[53], Ex. 22 at p. 11.

Later that year, on Walton's year-end evaluation, Crowe's overall comment states:

> Hamilton [Plant] has had a good year overall. We in T&I have undergone a major process change in how we do business. . . . In order to meet expectations overall in 2021, Charles has to have good attention to detail (quality), push through to completion (finish) and be more assertive in communicating his project results in PWA, to upper management and to his peers.

*Id.*

4

Walton's own comment on his 2020 year-end review reads as follows:

> This has been a very good year as far as how our teams impact the profits of Hamilton. It is very rewarding to know that I had a part in insuring [sic] the future of this company. These immediate improvements were made possible by the management style of our AI Leader and ultimately by Neil and Paul laying the platform for improvement.

*Id.*

Walton's overall year-end rating in 2020 was "meet expectations." *Id.*

According to Crowe, Walton's performance issues continued in 2021. On his 2021 mid-year performance evaluation, Crowe gave Walton an overall rating of "meets expectations minus."[2] Crowe contends that Walton's work product was poor and that his peers provided negative feedback about working with him. Tronox submitted declarations of a number of employees who worked with Walton. *See* [53], Ex. 4-15.[3] Several of the declarants contend that Walton often failed to complete projects on time, which interfered with their work, and that he lacked the knowledge expected of an electrical engineer with his history.[4] For example, fellow Senior Asset Improvement Engineer Richard Schmidt alleged as follows:

> 2. From August 2018 until January 2022, I worked directly with Charles Walton ("Walton") in Asset Improvement. Walton and I worked together on many projects. As an Electrical Engineer, Walton would be responsible for the electrical aspects of the projects and I would take responsibility for the mechanical aspects.

---

[2] The Court notes that the manager's overall rating does not appear to be filled in on this evaluation. *See* [40], Ex. 23. The only overall rating shown is the "Employee Self-Assessed Overall Rating" with employee comments. *See id.* at p. 8-9. However, when asked about the evaluation at his deposition, Walton did not dispute that he received a "meets expectations minus" on his 2021 mid-year evaluation. [53], Ex. 1 at p. 72.

[3] Tronox submitted declarations of thirteen employees. Some declarants were engineers, others were supervisors, and one was HR Director Worth. Most declarants describe issues that arose while working with Walton or while their subordinates worked with Walton. *See* [53], Ex. 3-5, 9-10, 11-15. Others describe the hiring process for certain positions related to Walton's failure to promote claim. *See* [53], Ex. 3-5, 6-9. The Court will set forth the facts regarding the failure to promote claim below.

[4] Prior to working at Tronox, Walton was a production manager and business improvement coordinator at Auto Parts Manufacturing, a Toyota-owned company near Tupelo, Mississippi. In that role, Walton supervised approximately 300 employees. He worked there for five and one-half years. Prior to that, Walton held engineering and supervisory positions at various plants for approximately 25 years.

> 3. Walton is a nice person who always has a friendly disposition. However, he has difficulty multi-tasking and completing assignments in a timely manner. Due to these issues, there were a number of occasions where I had to complete both my assignments and Walton's assignments on projects in order complete the projects. For an example, Walton and I worked together on the K-Plus project. I gave Walton 3 OEM manuals for him to complete the electrical side. After he had the manuals for a year with little to no progress, I had to take them back and complete his portion of the assignment.

[53], Ex. 10 at p. 1.

Schmidt also asserted that he inherited most of Walton's workload after his termination and that he had no problem catching up on it. *Id*. at p. 2.

Additionally, Robbie Prestridge, who was an Electrical and Instrumentation Planner at the time, alleged as follows in his declaration:

> 2. During his employment with Tronox, I had the opportunity to work with and observe the work of former Senior Asset Improvement Engineer, Charles Walton ("Walton"). Walton would constantly come to me asking for assistance with his projects. Eventually, the requests became so frequent that my supervisor, Colby Logan, told Walton I would no longer be available to assist him. My understanding is that Colby Logan reported to Walton's supervisor, Byron Crowe, that Walton was distracting me with his constant requests for help and that he had told Walton that I did not have time to help him.
>
> 3. Walton's knowledge of the Hamilton plant was very limited. He also had trouble listening and comprehending when things were explained to him. As a result, Walton had difficulty working independently.
>
> 4. Walton had trouble completing projects after he started them. For example, Walton and I worked together on a project that involved moving a substation transformer from T-4 position to T-1 position. Walton was responsible for documentation, creating one-line drawings, and preparing the management change form. I was responsible for getting the transformer moved, and I had the transformer moved long before Walton completed his tasks. In fact, he came back to me 1.5 to 2 years later and asked me to help him

> complete the management of change form. To my knowledge, Walton never completed the management of change form.

[53], Ex. 14 at p. 1-2.

For his part, Walton contends that he was performing the jobs of four different people. During his deposition, Walton testified that he performed the work of a Reliability Engineer and Process Lead Engineer for a year while those positions were empty and that his workload doubled when Reliability Engineer Steve Merritt retired. *See* [53], Ex. 1 at p. 71, 76. He also testified that Danny Roberts, Reliability Leader, was not qualified for that position and therefore Walton had to do Roberts' work for him. Maintenance Manager Shane Foster denies that Walton's workload increased for these reasons. His declaration provides:

> 6. Reliability has a position for an Electrical Engineer. After Steve Merritt retired from this position, Tronox filled the position with several individuals at different times, including James Head, Rajool Metha, and Latief Laminai. While Walton may have been asked to provide support at times after Merritt's retirement, this support would not have significantly increased his workload. The electrical engineering needs in the area were primarily met by the aforementioned engineers. If anything, based on reports I heard, Walton was often coming to these engineers asking for assistance on his projects and tasks.
>
> 7. Likewise, Walton did not have to provide significant support to Roberts after he took the role of Reliability Leader. As mentioned previously, he may have been asked at times to provide electrical engineering support when the electrical engineering position in Reliability was vacant. However, Roberts was more than capable of performing the tasks of Reliability Leader. He did not need Walton's assistance to perform these tasks and I did not see or hear anything to indicate he was providing Roberts with any such assistance.

[53], Ex. 9 at p. 2-3.

In his declaration, Crowe seems to admit that Merritt's retirement may have had *some* impact on Walton. His declaration states:

29. The retirement of Electrical Engineer, Steve Merritt, in Reliability did not significantly impact Walton's workload. While Walton, at times, may have been asked to provide some electrical engineering support in Reliability, Tronox either hired or contracted with multiple Electrical Engineers between Merritt's retirement and the termination of Walton's employment who would have handled the majority of the electrical engineering responsibilities in that department. Furthermore, as part of the planning and management of his work, Walton, at any time, could have sought to extend deadlines on projects, or reassign work tasks, if he believed any of the responsibilities he was being given in Reliability were adversely impacting his ability to meet other deadlines. However, Walton never approached me about extending deadlines or reassigning tasks due to any responsibilities he had in Reliability.

[53], Ex. 3 at p. 7-8.

Additionally, regarding the allegation that his peers complained of issues with his work, Walton testified that Robbie Prestridge lied when he reported to his supervisor that Walton was mismanaging the transformer project. [53], Ex. 1 at p. 73. Walton alleges that Perry Gordon, Prestridge's fellow Electrical and Instrumentation Planner, told him that Prestridge originally intended to place blame on Brad Mobley, an engineer with 150 overdue tasks, but Prestridge ultimately blamed Walton. *Id*. According to Walton, Prestridge's lie resulted in Crowe's contention that his managerial peers were complaining about Walton pulling their employees for assistance. *Id*. at p. 72. However, while Walton contends that he repeatedly told HR about Prestridge's lie, he admits that he was unsure of whether Crowe knew of the lie at the time he issued the written reprimand discussed below. *Id*. at p. 74.

According to Crowe's declaration, by the fall of 2021, Walton's performance had not improved, and he recommended to his supervisor, T&I Manager Neil Caston, that a written reprimand be issued to Walton. Crowe asserts that Caston and HR Director Worth agreed with the issuance of a written reprimand, and Worth assisted him in preparing it.

In a meeting on October 1, 2021, Crowe met with Walton and issued the written reprimand. Under the "Corrective Action Plan" portion, the written reprimand reads as follows:

> Within the next 30 days, you must provide a written plan on what steps you will personally take to improve your performance, immediately. This includes demonstrating the ability to effectively manage your work, completing tasks on time, producing results of the highest quality, with little to no dependence on others. Charles, post this 30 day period, if there are any missed, delayed or lacking projects you will be termed.

[53], Ex. 19 at p. 2.

At the meeting, Walton did not sign the reprimand, and he made a verbal complaint of racial discrimination. On the reprimand, Crowe wrote: "Charles feels that the plant has been discriminatory in promotion and previous evaluations. This is unfair and unjustified. The workload is doubled due to Steve Merritt retirement." *Id.* at p. 1. Shortly after his receipt of the written reprimand, Walton filed a charge of discrimination with the EEOC. The Court will address the events following the reprimand before returning to the EEOC Charge.

At his deposition, Walton testified that approximately one week after his receipt of the written reprimand, he met with Worth and Crowe and submitted a written plan (as required by the reprimand) and a rebuttal. [53], Ex. 1 at p. 75. He asserted that the plan was acceptable to Crowe and showed that he had already completed 24 of his 25 late safety assignments. *Id.* at p. 76.

The document Walton submitted as his written plan has three charts: one shows the number of late safety action items Walton had outstanding each month, one appears to show a target date for the completion of the late items, and one shows the other engineers' outstanding late tasks. [57], Ex. 5 at p. 1. Below the charts are three statements that are presumably rebuttal statements regarding three specific late tasks. Regarding the "MCC Plan," the first one states: "submitted documents for the 3rd time on 7/29/21." *Id.* Regarding the "Transformer and Oil Switch Testing

9

Standard," the second states: "submitted two documents for the 3rd time on 7/10/21 – total of 4 pages." *Id*. And in the third statement, Walton contends that Robbie Prestridge's allegation that he mismanaged a project was false. *Id*.

Walton further testified that he met with Crowe and Worth again on October 21, 2021.[5] He asserted that, on that day, he told them he would not have all assignments completed, but he did not remember discussing an extension. Ultimately, Walton agreed that he still had late assignments 30 days after receipt of the reprimand and when he was terminated in January of 2022. However, he alleged that he was "steadily flooded with other people's work" and that Crowe continuously returned work to him as "incomplete." [53], Ex. 1 at p. 78, 80.

According to Worth's declaration, on October 21, 2021, when Walton, Crowe, and Worth met to discuss Walton's progress on the written reprimand's Corrective Action Plan, "Walton acknowledged that he had not developed the written plan required under the reprimand and asked for a one-week extension of the 30-day deadline. He was provided an extension through November 5, 2023." [53], Ex. 4 at p. 4. In his declaration, Crowe asserts that "the only item [Walton] presented was a simple spreadsheet provided on November 12, 2021 (a week after the deadline for submission of the written plan), which set forth a schedule for when he intended to complete certain tasks." [53], Ex. 3 at p. 6. Therefore, Crowe asserts, he recommended Walton's termination to Site Director Jimmy Killebrew after Walton failed to comply with the written reprimand by the November 5, 2021 deadline. *See id*.

---

[5] Walton first testified that he presented a written plan and rebuttal materials to Crowe and Worth approximately one week after he received the written reprimand. [53], Ex. 1 at p. 75. However, Walton later testified that the rebuttal materials were discussed on October 21, 2021 and that there was an additional meeting after that. *Id*. at p. 77. In any event, Walton's position is that he submitted an acceptable written plan prior to his deadline to do so. *See* [58] at p. 9.

In his declaration, Killebrew asserts that he approved the recommendation to terminate Walton. However, his declaration provides as follows:

> 4. In November 2021, Walton filed a charge of discrimination against Tronox with EEOC. EEOC contacted Tronox about mediating the Walton charge through its mediation program. Tronox and Walton both consented and the mediation was scheduled for January 20, 2022. I approved delaying the implementation of the decision to terminate Walton's employment until after the mediation in a good faith effort to reach a resolution with Walton. Walton was allowed to continue working in the interim.

> 5. Worth was selected to attend the mediation on behalf of Tronox along with outside counsel. In light of the termination decision, I decided that any monetary offer to Walton would be made contingent on his voluntary resignation from employment at Tronox. I also decided to proceed with implementation of the termination decision, along with the offer of a severance package, on the day after the mediation if the mediation was unsuccessful.

[53], Ex. 7 at p. 2.

Walton did not voluntarily resign. He was terminated on January 21, 2022—the day after the unsuccessful EEOC mediation.

This brings the Court back to Walton's EEOC Charge. As noted, Walton verbally complained to Tronox about racial discrimination on October 1, 2021 when he was issued the written reprimand. Crowe documented Walton's complaint on the written reprimand.

Walton initially contacted the EEOC on October 6, 2021, though his EEOC Charge was formally filed on November 2, 2021. *See* [57], Ex. 6 at p. 1. Tronox was given notice of the Charge via email on November 9, 2021. *See* [64], Ex. 2 at p. 1. In his Charge, Walton alleges that he was discriminated against on the basis of race because his white coworkers were paid more than him and were not reprimanded for late tasks. *Id*. He further asserted that he had been passed over for promotions and that he was assigned more safety action items in a three-month period than any other employee. *Id*.

The EEOC Charge Detail Inquiry shows that mediation was offered to both Walton and Tronox on November 29, 2021. *Id.* at p. 2. As noted, the parties participated in an EEOC Mediation on January 20, 2022. The mediation did not result in a settlement. Walton was terminated the following day.

Walton thereafter initiated this action. He has abandoned some claims; his retaliation and discriminatory failure to promote claims, brought under 42 U.S.C. § 1981 and Title VII, are his only remaining claims. Tronox moves for summary judgment as to all of Walton's claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold*

*v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

Analysis and Discussion

The Court will address Walton's retaliation claims before turning to his failure to promote claims.

## I.    Retaliation

Though Walton brings his retaliation claim under both Section 1981 and Title VII, "[t]he legal framework governing these claims is coextensive." *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (citing *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007)). Where, as here, a plaintiff does not present direct evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies. *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) (citing *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021)).

Under that framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation. *Harville v. City of Houston*, 945 F.3d 870, 874 (5th Cir. 2019). "To establish a prima facie case of retaliation, [the plaintiff] must show that: 1) [he] engaged in a protected activity; 2) [he] suffered an adverse employment action; and 3) there is a causal connection between the two." *Owens*, 33 F.4th at 835 (citing *Saketoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022)). "The prima facie case, once established, creates a presumption of discrimination and the burden then shifts to the [employer] to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Harville*, 945 F.3d at 875 (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)). If the employer articulates a legitimate, non-

discriminatory reason, the burden shifts back to the plaintiff "to 'demonstrate that the employer's proffered reason is a pretext for discrimination.'" *Id.* (citing *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 426 (5th Cir. 2017)).

A.      *Prima Facie Case*

First, the parties do not dispute that Walton has established a prima facie case of retaliation for summary judgment purposes. He first complained of race discrimination to Crowe on October 1, 2021. He finalized his EEOC Charge on November 2, 2021 and engaged in an EEOC mediation on January 20, 2022. He was thereafter terminated on January 21, 2022. "[C]lose timing between the protected activity and adverse action can establish the causal link required to assert a prima facie case." *Owens*, 33 F.4th at 835. Regardless of whether the Court treats October 1, 2021 (the day of Walton's verbal complaint) or November 2, 2021 (the day Walton filed his EEOC Charge) as the date of Walton's protected activity, the time between the protected activity and January 21, 2022 (the day Walton was terminated) would likely be a sufficiently short period of time to establish a causal link at the prima facie stage. *See January v. City of Huntsville*, 74 F.4th 646, 653 (5th Cir. 2023) ("We've repeatedly held periods of a few months sufficient to satisfy causation in a prima facie case.") (citing *Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 219 (5th Cir. 2016); *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001)).  As noted above, this issue is not disputed for summary judgment purposes, and the Court therefore sees no need to address it any further.

B.      *Legitimate, Non-Retaliatory Reason*

Second, Tronox has produced a legitimate, non-retaliatory reason for Walton's termination—"a prolonged period of unsatisfactory performance, which culminated with his

failure to satisfy the corrective action plan[.]" [54] at p. 21. This is sufficient for summary judgment purposes.

C. *Pretext*

The parties' dispute centers on the third step of the analysis. "To survive summary judgment now, [Walton] must show that his protected act was a but for cause of his termination." *January*, 74 F.4th at 654 (citing *Owens*, 33 F.4th at 835) (internal quotation marks omitted). To do so, he must produce "substantial evidence" indicating that Tronox's proffered reason is a pretext for its "actual retaliatory reason." *Id*. (citing *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015)); *Abbt v. City of Houston*, 28 F.4th 601, 611 (5th Cir. 2022). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [triers of fact] in the exercise of impartial judgment might reach different conclusions." *Owens*, 33 F.4th at 826 (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 579 (5th Cir. 2003)). "A plaintiff may show pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Harville*, 945 F.3d at 879 (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010)).

Importantly though, even where a plaintiff presents evidence tending to show that the employer's justification is false or unworthy of credence, "that is not necessarily enough." *Owens*, 33 F.4th at 826. It *can* be enough where it is "of sufficient 'nature, extent, and quality' to make the inferential leap to [retaliation] a rational one." *Id*. at 826 n. 7 (quoting *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 903 (5th Cir. 2000)); *see e.g., Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) (employer's shifting and inconsistent reasons, which contradicted employee's recent glowing performance reviews, sustained an inference of pretext). But generally, the plaintiff must additionally present "more than a 'mere scintilla of evidence'" that the employer's true reason

15

for his termination was retaliation for the protected conduct. *January*, 74 F.4th at 655 (citing *Owens*, 33 F.4th at 834).

Moreover, the protected conduct must be "*the* reason for the adverse action." *Owens*, 33 F. 4th at 835 (emphasis in original). "In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Id*. (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).

Here, Walton relies on the following evidence to demonstrate pretext: (1) temporal proximity evidence; (2) evidence suggesting that Tronox did not intend to terminate him at the time he allegedly failed to comply with the written reprimand; (3) evidence tending to cast doubt on the reliability of Crowe's notes and declaration; and (4) evidence that other engineers with late tasks were not disciplined. The Court will consider each category of evidence in turn.

### 1. Temporal Proximity Evidence

To demonstrate pretext, Walton first emphasizes that his termination occurred one day after he participated in the EEOC mediation. "The temporal proximity between [Walton's] protected activity and [his] termination is relevant to, but not alone sufficient to demonstrate, pretext." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 579 (5th Cir. 2020) (citing *Strong v. Uni. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)). Temporal proximity evidence must be combined with other "significant evidence" of pretext to survive summary judgment. *Garcia v. Pro. Cont. Serves., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999)).

By emphasizing that his termination occurred the day after the EEOC mediation, Walton suggests that his participation in the mediation is a protected activity separate and apart from the

filing of his EEOC Charge. This characterization would allow Walton to assert that he was terminated only one day after he engaged in a protected activity, rather than several months after the activity, which would be more suggestive of retaliation. Walton has cited no cases to support his apparent position that the mediation itself constitutes a separate protected activity for purposes of calculating temporal proximity, but the Court does not see the need to decide the issue here.

Even assuming that Walton's participation in the mediation was a protected activity and that he was terminated on the following day, he must combine his temporal proximity evidence with other significant evidence of pretext to survive summary judgment. *Garcia*, 938 F.3d at 243. The termination occurring immediately after the mediation does create the appearance that the termination related to Walton's accusations of discrimination, which would have been discussed at the mediation, or his participation in the mediation itself. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) ("Types of indirect proof to be considered in finding a causal nexus may include the temporal proximity of factual hearings regarding discrimination complaints as well as the actual date of filing."). Nevertheless, regardless of the conclusion on that issue, the Court must consider whether Walton has pointed to *additional* evidence of pretext to satisfy his burden.

### 2. *Timing of Termination Recommendation*

Next, Walton contends that Tronox did not terminate him for his failure to comply with the reprimand because Crowe did not recommend his termination when he allegedly failed to comply with the reprimand by the November 5, 2021 deadline. Crowe's declaration states: "Due to Walton's failure to comply with the requirements of the written reprimand by the November 5th deadline, such as his failure to present the required written plan, I subsequently recommended to the Site Director, Jimmy Killebrew, that Tronox terminate Walton's employment consistent with the written reprimand." [53], Ex. 3 at p. 6. Thus, Crowe's declaration does not provide the exact

date that Crowe recommended Walton's termination, but he associates his recommendation with the passage of the November 5, 2021 deadline. At his deposition, when asked, "When did you make the recommendation to [Killebrew] for termination?" Crowe answered, "I don't recall the exact date. Seem like it was in January. I don't remember the specifics." [53], Ex. 16 at p. 9. Comparing the two, Walton contends that Crowe's declaration and deposition contain conflicting evidence regarding when the termination recommendation was made. Therefore, according to Walton, his firing relates to the EEOC Charge and not the passage of the November 5, 2021 deadline.

Tronox responds that the declaration and deposition are not inconsistent because the declaration does not provide the exact date that Crowe made the recommendation. Tronox contends that the termination recommendation merely followed the process set forth in the reprimand that was issued *prior* to the protected activity; the recommendation was made at some point after the November 5, 2021 deadline; and the disciplinary process was delayed by the filing of the EEOC Charge because the company contacted outside counsel.

The Court does not find a glaring inconsistency in Crowe's declaration and deposition, as Walton suggests. What's more, the Supreme Court has held that where a gradual adverse employment action begins prior to an employee's protected activity, "[the employer] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001). However, the Court finds it crucial that Tronox did not simply proceed down the path set forth in the reprimand. While Tronox contends that Walton was fired for failure to comply with the reprimand and that the termination decision was made well in advance of mediation, the record reflects that the recommendation may not have occurred until months after

18

the November 5, 2021 deadline and after Tronox continued to work with Walton on his performance. This casts doubt on Tronox's explanation.

In addition to Crowe's deposition testimony suggesting he did not recommend Walton's termination until January—long after the November 5, 2021 deadline passed—HR Director Worth's deposition and declaration indicate that Crowe did not recommend Walton's termination upon his failure to comply with the reprimand's deadline. At her deposition, Worth stated the following:

> Q.  . . . Do you recall meeting with Mr. Walton in Mr. Crowe's office on December 16th?
>
> A.  December?
>
> Q.  December 16th in Byron Crowe's office meeting with Mr. Walton?
>
> A.  I do remember meeting with Mr. Walton and Byron. I'm not certain of the date.
>
> Q.  Would it have been around December 16th you had a meeting in Byron Crowe's office with Mr. Walton?
>
> A.  Yes, sir.
>
> Q.  Okay. Do you recall during that meeting throwing papers in the air and telling Mr. Walton that Byron was not trying to fire him?
>
> A.  I do not recall throwing any papers in the air. I do recall trying to get them to talk and clarify and understand what the performance improvement plan was about.

[53], Ex. 17 at p. 8-9.

Additionally, in her supplemental declaration, Worth stated:

> After EEOC served Tronox with notice of Charles Walton's ("Walton") charge of discrimination in November 2001 [sic], Tronox, consistent with its typical practices, retained outside counsel to represent it in response to the charge and to evaluate the

allegations prior to taking the next steps in Walton's disciplinary process. At that juncture, Walton had failed to comply with the terms of the October 1, 2021, written reprimand by the extended compliance deadline, but his supervisor had not yet formally recommended termination consistent with the terms of the reprimand and no termination decision had been made by the Site Director. The evaluation by outside counsel resulted in a delay in the recommendation and decision-making process. However, the final termination decision was made well in advance of the January 2022, EEOC mediation with the implementation of the termination decision delayed until after the mediation in a good faith effort to reach a resolution with Walton.

[64], Ex. 1 at p. 1.

Thus, Worth's deposition demonstrates that Crowe was still attempting to work with Walton on the performance improvement plan in December 2021, more than a month after the November 5, 2021 deadline had passed. Additionally, Worth's declaration demonstrates that when the EEOC served Tronox with Walton's Charge, "at that juncture," Walton had already failed to comply with the reprimand, but his termination had not yet been recommended. While Worth's declaration states that the decision to terminate Walton occurred well before the January 21, 2022 mediation, the evidence suggests that Crowe did not actually recommend Walton's termination upon the passage of the deadline and that he continued to work with Walton on his performance. Then, the day after the mediation, Walton was terminated. This could lead a reasonable jury to find that Tronox terminated Walton due to his discrimination allegations, and not due to his alleged failure to comply with the reprimand.

Further, according to the EEOC Charge Detail Inquiry, the EEOC did not offer the parties mediation until November 29, 2021. [57], Ex. 6 at p. 2. If Crowe had recommended termination shortly after the November 5, 2021 deadline passed, it seems that the termination decision would not have been delayed due to a desire to resolve the matter via mediation (as Worth's declaration states) because mediation was not offered until over three weeks after the passage of the deadline.

Moreover, Worth's declaration inconsistently suggests that Crowe's recommendation was delayed when counsel was retained due to service of the EEOC Charge on November 9, 2021, which would have been before mediation was offered. In any event, any conflicting evidence regarding whether or why Crowe delayed his recommendation cannot be resolved at this stage of the proceedings.

Overall, the evidence indicates that Crowe did not recommend Walton's termination until well after the November 5, 2021 deadline had passed. A reasonable jury *could* conclude from this evidence that if Tronox truly intended to terminate Walton for his failure to comply with the reprimand, it would have terminated him shortly after the deadline passed when it allegedly had well-documented reasons to do so, rather than continuing to pay him and attempting to improve his performance. On the other hand, a reasonable jury could believe Tronox's explanation that it fully intended to terminate Walton when he failed to comply with the reprimand, but it delayed its decision in an attempt to resolve the EEOC Charge.

Additionally, the Court is cognizant that Walton must point to disputed facts demonstrating not only that Tronox's proffered reason was false but also that the only reason for his termination was retaliation for his EEOC Charge. *See Owens*, 33 F. 4th at 835. "[E]ven if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Id*. (quoting *Long*, 88 F.3d at 305 n.4). However, again, because it appears that Crowe continued to work with Walton on performance improvement and that Walton was fired one day after the mediation, a reasonable jury could find (1) that Tronox did not intend to terminate him for his failure to comply with the reprimand and (2) that Tronox terminated him due the allegations he brought via the EEOC Charge and discussed at the mediation.

Before turning to the next piece of evidence, the Court notes one additional argument that Tronox raises relating to its intention to terminate Walton for his failure to comply with the reprimand. Tronox points to a statement Walton made at his deposition and contends that this "adverse admission" is alone enough to demonstrate that Tronox did not fire him solely because of his EEOC Charge. [65] at p. 3. Specifically, at his deposition, Walton stated: "So my—my termination was guaranteed. I was—I was fired on the first day he wrote that reprimand. He could have just walked me on out the door that day." [53], Ex. 1 at p. 84. According to Tronox, this was an admission that he would be fired for failing to comply with the reprimand and not due to the EEOC Charge.

The Court notes that Walton made this statement while explaining that he felt the reprimand set an impossible goal of having no late tasks, particularly considering that he was allegedly doing the job of four people. Walton's full statement reads as follows:

> Q.   So you're saying -- your statement you were feeling overwhelmed, helpless, and hopeless, that applies to the way you felt after the termination?
>
> A.   And during it. It was terrible. I was –
>
> Q.   What do you mean when you say –
>
> A.   Well, this went on – somebody has given you a goal no one can reach. Zero late items. Nobody there had zero late items. If I got one late item I'm terminated. You already done terminated me. You don't have to wait 30 days. Nobody can achieve zero late items. If you are, they're not giving you enough work. I'm doing three, four people work – you hear me – even a fifth person's work, and you think I'm not going to have a late item.
>
> So my – my termination was guaranteed. I was – I was fired on the first day he wrote that reprimand. He could have just walked me on out the door that day.

*Id.*

22

A reasonable jury could draw numerous inferences from this statement. It appears Walton concluded that Crowe could have fired him the day he issued the reprimand because it was not possible to achieve it. Given that Walton's deposition demonstrates that he believed he was not being treated fairly with respect to his assignments, a jury could infer that Walton believed the reprimand was used as a pretextual means of ensuring his termination because Crowe knew he would be unable to comply with it. On the other hand, a reasonable jury could infer from the statement that Walton knew he would be fired if he did not comply with the reprimand, thereby undermining his claim that he was fired in retaliation for his EEOC Charge. The inferences to be drawn and credibility determinations to be made from this statement cannot be resolved at this stage of the proceedings. The Court rejects Tronox's argument that this statement, without more, is dispositive of Walton's retaliation claim. *See Birchfield v. City of West Point, Miss.*, 2021 WL 277810, at *8 (N.D. Miss. Jan. 27, 2021) (finding plaintiff's statement that he did not "really have any understanding" of his claim insufficient to itself justify dismissal of the plaintiff's claim).

### 3. Crowe's Notes and Declaration

Next, Walton takes issue with the fact that Crowe's notes do not reference the EEOC Charge or "any claim that Crowe was discharging Walton because he failed to comply with a performance improvement plan." [58] at p. 13. According to Walton, whether Tronox omitted the notes intentionally or whether the notes never existed, the lack of notes on these issues would allow a jury to infer that the EEOC Charge was the real reason for his termination. For its part, Tronox contends that it produced all of Crowe's notes from the relevant time period. While the Court is permitted to draw "justifiable inferences" in favor of the non-moving party, this inferential leap more so resembles speculation that "does not adequately substitute for specific facts showing a

genuine issue for trial." *TIG Ins. Co.*, 276 F.3d at 759. However, the Court does find Crowe's notes remarkable for another reason.

Crowe's notes from the weeks approaching the November 5, 2021 deadline read as follows:

10/21/21

Met with Talia and Charles. He presented graphs showing how he has progressed with completing tasks. However, he hasn't completed a plan. Requested and granted extra week – due November 5, 2021. I stressed that he is still managing day-to-day and not building a longer term plan to improve how he plans his work.

10/28/21

Discussed with Charles his MCC spare review with maintenance. He still has to complete all tasks per that REF-20 from August. Also reminded him that he has not presented a plan per the written reprimand. I explained what I was looking for and offered some suggestions. He said he understood.

10/29/21

Printed out Charles' draft self assessment. Discussed with Talia that he is still rating himself AX to AX- even though that isn't realistic per the goals.

10/31/2021

Discussed the written reprimand with Charles. I read the document. He did not agree, stating the company was discriminatory. He stated that a lawsuit and paperwork would follow if I turned it in to Talia. Then we discussed specifics – he feels the workload is too much, but his examples were about things in the field – not AI tasks . . . I told him part of his written plan, due by 10/31/2021, could include training Latief (Reliability) and transitioning some of that work back to them. At the end of the conversation, he admitted I had a legitimate complaint about his work not being complete. I stressed to him that his lack of planning his work is his biggest contributor. His 30 day plan should include specific things he will do to correct performance. He again said he felt he was not being utilized by the company and could be in a management role and "do so much

24

more." He would not sign the document and said he wanted to talk with Talia. I submitted the documentation to Talia @ 9am.

10/31/2021

Charles requested vacation for remainder of today and all of next week.

11/1/2021

Multiple emails to and from Charles on MCC long term plan. He still doesn't understand the requirements on "long term" plan. Only going back to short term spares. He and I have discussed this numerous times in the past as noted in the email.

11/4/2021

Cannot locate any PM documentation on the PWA site for chlorination optimization phases 1 and 2 or ASU. I called Danny Roberts and he hasn't received any PM requests from Charles.

[53], Ex. 3 at p. 15-17.

Crowe's notes *do* mention Walton's deadline to comply with the written reprimand. However, the notes are not consistent with each other or with Crowe's declaration. First, the note from October 31, 2021 appears to document the meeting between Walton, Crowe, and Worth, where Walton was presented the reprimand and complained of discrimination. However, Crowe's declaration and the reprimand itself reflect that that meeting occurred on October 1, 2021—not October 31, 2021, as recorded in Crowe's notes. *See* [53], Ex. 19 at p. 1.

Further, the note from October 21, 2021 states that Walton's extended deadline to comply with the reprimand was now November 5, 2021. On the other hand, the note purportedly written on the later date of October 31, 2021 states that the deadline was October 31, 2021—that day. If the notes were correct, the extension would have been granted before October 31, 2021. These inconsistencies create the appearance that the entries were incorrectly dated when written, written and later incorrectly backdated, or otherwise unreliable. The issues with the dates of the entries

25

could possibly cause a reasonable jury to doubt Tronox's explanation, which itself hinges on the dates of Walton's compliance and Crowe's account of Walton's performance issues.

Further, Crowe's declaration states that Walton submitted graphs at the October 21, 2021 meeting, and his notes reflect the same. [53], Ex. 3 at p. 6, 16.  However, his declaration later states that the "only item" presented was a spreadsheet presented at the November 12, 2021 meeting. [53], Ex. 3 at p. 6. It is unclear to the Court whether the spreadsheet referred to is the same as Walton's document containing the graphs. The document with graphs is the only one found in the record. Whether the spreadsheet and the document with graphs are one and the same, the declaration seems to be inconsistent. It states that the "only item" submitted was submitted on November 12, 2021, while also contending that a document containing graphs—possibly the same document—was submitted on October 21, 2021. It is unclear whether there were two documents or one document, and whether they were submitted before or after the deadline. Again, this inconsistency is noteworthy because Tronox contends that Walton failed to comply with the deadline, while Walton contends that he submitted a satisfactory written plan prior to the expiration of the deadline.

The Court finds the second October 31, 2021 entry noteworthy as well. It states that Walton requested to take vacation days the following week, which would have been the week of his deadline to comply with the reprimand. It appears that Crowe granted Walton permission to take a vacation in the days leading up to and including his deadline, which could possibly impact Walton's ability to timely comply with the reprimand, yet Crowe did not include that important information in his declaration. In fact, the Court does not find that detail mentioned elsewhere in Tronox's briefs or evidence. This could lead a reasonable jury to conclude that (1) Crowe granted Walton permission to take a vacation because he did not think the deadline was significant; (2)

Crowe did not properly date his notes; or (3) Crowe's declaration is generally unworthy of credence because it left out a significant detail that would have impacted whether Walton complied with the deadline.

These aspects of Crowe's notes and declaration could lead a reasonable jury to find that Tronox's proffered justification for Walton's termination is unworthy of credence.

### 4. Disparate Treatment

Walton asserts that other engineers who are white had more late assignments than him and did not receive reprimands. "Typically, '[a] plaintiff who proffers the treatment of a fellow employee must show that the plaintiff's termination was taken 'under nearly identical circumstances' as those faced by the comparator." *Brown*, 969 F.3d at 580 (citing *Garcia*, 938 F.3d at 244). "Employees are similarly situated when they hold the same job responsibilities, share the same supervisor or have their employment status determined by the same person, and have essentially comparable violation histories." *Id.* (internal brackets omitted). However, disparate treatment of less similarly situated comparators may be considered as "some evidence of pretext, even though it is less probative than evidence of a more similarly situated comparator." *Id.* (citing *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 950 (5th Cir. 2015)).

According to the EEOC Charge Detail Inquiry, Walton provided the following information in an interview with the EEOC:

> On October 1, 2021, I went back to work the next day and I wanted to see how many tasks everybody got. So [Tronox] got a system called PWA that shows everybody assignments and late tasks. On this system, I had 25 late tasks; Capital Project Engineer Brad Mobley had 150 late tasks; Asset Improvement Engineer Andy Criswell had 19 late tasks; Capital Project Engineer Danny Whitler had 43 late tasks; Capital Project Engineer Jeremy Armstrong had 42 late tasks; Capital Project Engineer Dillan Berryman had 58 late tasks; Process Engineering Lead William Summerford had 60 late tasks; Accountant Dept Nicole Harper had 16 late tasks; Capital

> Project Engineer Gordon Colbert had 17 late tasks; Reliability
> Engineer John Newman had 8 late tasks and Asset Improvement
> Engineer DeAnn Hughes had 0 late tasks. Nobody in this whole
> group is operating without any late tasks. No one else has been
> written up.

[57], Ex. 6 at p. 3.

In his declaration, Walton asserts that "[t]he engineers with whom I compare myself on page 4 of the EEOC Charge Detail Inquiry are white engineers." [57], Ex. 4 at p. 1.[6]

Relevant to whether the other engineers with late tasks were similarly situated to Walton, Andy Criswell and Brad Mobley were also engineers supervised by Crowe. *See* [53], Ex. 1 at p. 80. Criswell had 19 late tasks, and Mobley had 150 late tasks.

Tronox argues that Walton's evidence of disparate treatment is insufficient because he has failed to show that he is similarly situated to other comparators with late tasks. As to Andy Criswell, Tronox asserts that Criswell was not similarly situated because he was nearing retirement, and Walton acknowledged that Criswell was nearing retirement at his deposition. *See* [53], Ex. 1 at p. 79. Tronox also emphasizes that Criswell had six fewer late tasks than Walton, and "[t]he other two AI engineers had no more than a couple of late tasks." [54] at p. 20.

As to Brad Mobley, Tronox emphasizes that he came under Crowe's supervision after his original supervisor, Jayson McConnell, was fired for poor management of the Capital Projects Unit. Tronox asserts that engineers originally managed by McConnell were behind on their tasks due to McConnell's poor management and that Crowe began helping Mobley catch up on his tasks when he began supervising him. Though Walton raises this argument in the failure-to-promote section of his brief, Walton takes issue with Tronox placing the blame for the white Capital

---

[6] The Court notes that, at his deposition, Jimmy Killebrew testified that DeAnn Hughes, who is listed in Walton's EEOC document, was black. *See* [57], Ex. 8 at p. 11.

Projects engineers' late tasks on McConnell, while placing the blame for Walton's late tasks on Walton himself. *See* [58] at p. 18-19.

Tronox additionally asserts that underperforming white engineers *were* terminated. According to the declarations of Worth and Killebrew and disciplinary records submitted with the Motion [53], between October 2020 and October 2021, white engineers Russell Duke, Reid Mason, and Adam Witte were indeed terminated due to poor performance that did not improve after they were issued reprimands. *See* [53], Ex. 7 at p. 1; [53], Ex. 4 at p. 6; [53], Ex. 24-25, 27. As noted, McConnell, leader of the Capital Projects Unit, was also fired after receipt of a written reprimand.

Overall, the Court finds that Walton has pointed to sufficient evidence of disparate treatment. Both Criswell and Mobley were supervised by Crowe and had a significant number of late tasks but admittedly did not receive reprimands. While Walton has not produced evidence detailing their employment histories, the Court finds that they were similarly situated enough to consider the differential treatment as "some evidence of pretext, even though it is less probative than evidence of a more similarly situated comparator." *Brown*, 969 F.3f at 580; *see also Porter*, 810 F.3d at 950 (considering evidence of differential treatment received by four employees but noting that the plaintiff had not demonstrated that those employees were similarly situated); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) (noting different treatment of plaintiff and white co-worker, without comparing employees' positions, supervisors, or histories).

Though Walton has not produced a significant amount of evidence regarding disparate treatment, and though Tronox has provided explanations as to why Criswell and Mobley were not reprimanded for their late tasks, a reasonable jury could nonetheless view the facts presented and

29

reach differing conclusions as to whether identical circumstances existed and disparate treatment occurred. In particular, even considering Tronox's explanations, a reasonable jury could conclude that the differences in their circumstances were not meaningful enough to warrant the differential treatment. *See Brown*, 969 F.3d at 581 (finding insufficient evidence of pretext where employees were similarly situated but there were "meaningful differences between [the plaintiff's] and [the comparator's] responses to [an] incident that could explain their differential treatment").

At this stage, the Court is not tasked with deciding whether Tronox's explanation is credible or should receive more weight than Walton's—in fact, the Court is prohibited from doing so. *See Garcia*, 938 F.3d at 240 (citing *Kevin M. Ehringer Enters v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011)). Walton is only tasked with pointing to evidence that creates a question of fact as to disparate treatment, thus casting doubt on Tronox's proffered justification for his termination. He has done so.

Taking into consideration the evidence of temporal proximity, combined with the evidence casting doubt on Tronox's proffered explanation and the evidence of disparate treatment, the Court finds that Walton has created a question of fact as to whether his EEOC Charge was the but-for cause of his termination.[7] To the extent Tronox's Motion [53] seeks dismissal of Walton's retaliation claim brought under Title VII and Section 1981, it is denied.

This brings the Court to Walton's failure-to-promote claims.

---

[7] For the sake of completeness, the Court acknowledges that Walton has pointed to other evidence not discussed herein. Specifically, Walton points to a statement in Crowe's declaration stating that Walton did not present a written plan pursuant to the reprimand and "[i]nstead" filed an EEOC Charge. [53], Ex. 3 at p. 6. Walton contends that in this statement, Crowe links his termination to his EEOC Charge. Walton further points out that when he filed for unemployment, Tronox falsely reported to the Mississippi Department of Employment Security that he quit voluntarily. Tronox contends that a third-party contractor mistakenly made that representation. Lastly, Walton argues that he did in fact comply with the reprimand and that the reprimand set an impossible standard for him to satisfy. Again, the Court finds that the evidence previously discussed creates a question of fact as to pretext. While the Court acknowledges the other evidence Walton emphasizes, the Court sees no need to address it further.

*II.     Discriminatory Failure to Promote*

Walton alleges that Tronox failed to promote him to the following positions due to his race: Asset Improvement Leader, Capital Projects Leader, Reliability Leader, and Business Improvement "BI" Coordinator. Walton concedes that his failure to promote claims brought under Title VII are time-barred. Therefore, he brings these claims pursuant to Section 1981.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts. . . and to the full and equal benefit of all laws and proceedings. . . as is enjoyed by white citizens. . . ." 42 U.S.C. § 1981(a). As with Walton's retaliation claim, a failure-to-promote claim based on circumstantial evidence is subject to the *McDonnell Douglas* burden-shifting framework. *Johnson v. Pride Indus., Inc.*, 7 F.4th 392, 406 (5th Cir. 2021). The Fifth Circuit has described the applicable analysis as follows:

> Under the familiar *McDonnell Douglas* burden-shifting analysis, at summary judgment, a plaintiff must first establish a prima facie case of discrimination. To establish a prima facie case of discrimination based on a failure-to-promote theory, a plaintiff must show that (1) he is a member of a protected class; (2) he sought and was qualified for a position for which applicants were being sought; (3) he was rejected for the position; and (4) the employer either (a) hired a person outside of the plaintiff's protected class, or (b) continued to seek applicants with the plaintiff's qualifications. Next, if the plaintiff carries his burden to establish a prima facie case, the burden then shifts back to the employer to articulate a legitimate, nondiscriminatory reason for the underlying employment action. And if the employer satisfies this burden, the plaintiff must then provide adequate evidence to show the reason proffered is a mere pretext for unlawful discrimination.

*Id.* (citations omitted).

The Court will address Walton's claims as to each position in turn.

31

A. *Asset Improvement Leader*

Tronox contends that Walton cannot establish a prima facie case as to the failure to promote

him to the Asset Improvement Leader position because he did not apply for and was therefore not

rejected from this position. More specifically, Tronox contends that former T&I Manager Neil

Caston filled the position of AI Leader from the pool of applicants for the T&I Manager position.

The Court notes that Caston does not exactly provide that explanation in his declaration. Instead,

his declaration provides as follows:

> 3. In April 2019, Matt Chance, who was the Technology &
> Improvement Manager at the Hamilton Plant, took a position with
> Tronox's facility in Yanbu, Saudi Arabia. The position of Asset
> Improvement Leader was also vacant at that time due to the
> departure of Tony Carreiro. Byron Crowe ("Crowe"), who was the
> Capital Projects Leader, became the interim Technology &
> Improvement Manager. At that time, he also assumed the duties of
> the Asset Improvement Leader.
>
> 4. Before the end of 2019, I transferred into the Position of Technology &
> Improvement Manager. I subsequently approached Crowe about his
> interest in becoming the full-time Asset Improvement Leader. He was
> well-qualified for the position based on his engineering experience and
> his past experience in leadership positions as the Capital Projects Leader
> and the Reliability Leader at the Hamilton Plant. Additionally, he had
> already been performing the job in an interim role. He was interested in
> taking the job, and as a result, it was not necessary to open the position
> up for other internal or external applicants.

[53], Ex. 6 at p. 1-2.

However, Crowe's declaration does state that he was selected from the applicant pool for

T&I Manager. His declaration reads as follows:

> 3. In April 2019, Matt Chance, who was the Technology &
> Improvement Manager at the Hamilton Plant, took a position with
> Tronox's facility in Yanbu, Saudi Arabia. I was moved into this role
> as an interim. The position of Asset Improvement Leader was also
> vacant at that time due to the departure of Tony Carreiro. As the
> interim Technology & Improvement Manager, I essentially took on
> the responsibilities for both of these vacant positions.

> 4. I submitted an application to be the permanent Technology & Improvement Manager. However, Tronox chose Neil Caston ("Caston") for the position. Subsequently, I was approached by either Caston or Site Director, Paul Gilman ("Gilman"), about becoming the permanent Asset Improvement Leader, which was a lateral move for me from my former role as Capital Projects Leader. I accepted this offer and became the full-time Asset Improvement Leader in November 2019. Essentially, Tronox filled both of these vacant positions within the Technology & Improvement Department from the applicant pool for the Technology & Improvement Manger's position.

[53], Ex. 3 at p. 1-2.

In response, Walton alleges that he was the most logical candidate for the position. He asserts that, in addition to himself, there were three engineers in the AI Unit: Criswell was retiring, Schmidt had been demoted, and the third was a new hire. He further asserts that Crowe had no experience in asset improvement. Therefore, according to Walton, compared to Crowe and the other AI engineers, he was the logical candidate for the position.

Crucially, Walton does not point to evidence indicating that he applied for or was rejected from the AI Leader position.[8] Therefore, he cannot establish a prima facie case of discrimination based on the failure to promote him to this position. The Court grants Tronox's request for summary judgment as to this claim.

### B. Capital Projects Leader

As to the position of Capital Projects Leader, Tronox again alleges that Walton cannot establish a prima facie case because he did not apply for and thus was not rejected from this

---

[8] As this Court has previously noted, while an employee must generally prove that they applied to a position, "[his] 'failure to apply for a position does not bar [his] claim if [he] can show that such an application would have been a futile gesture.'" *Frensley v. North Miss. Med. Cntr., Inc.*, 2010 WL 3655860, at *6 n. 1 (N.D. Miss. Sept. 9, 2010) (citing *Shackelford*, 190 F.3d at 406) (additional citations omitted). However, "[t]his exception only applies where the potential applicant shows that [he] 'was deterred by a known and consistently enforced policy of discrimination.'" *Id*. (citing *Shackelford*, 190 F.3d at 406). Walton points to no evidence of a policy of discrimination in hiring.

position. According to Caston's declaration, Tronox's Corporate HR Department made the decision to exclusively partner with a military-focused staffing agency for candidates to fill this position. [53], Ex. 6 at p. 2. Tronox asserts that this decision was not motivated by discriminatory animus and impacted all Tronox employees equally because it did not seek any internal applicants.

For his part, Walton asserts that McConnell, the former military officer who was hired for the position, had no engineering experience. He takes issue with the fact that Tronox departed from its usual practice of internally posting positions and hiring experienced engineers to head departments. Walton's argument regarding Tronox's departure from previous hiring practices is most relevant at the pretext stage, and he has not pointed to evidence suggesting that he applied for this position. Thus, he cannot establish a prima facie case of discriminatory failure to promote. However, even assuming that Walton's claim could advance to the pretext stage of the analysis, an employer's departure from previous hiring practices, without evidence of discriminatory motive, is insufficient to establish pretext. *Inocencio v. Montalvo*, 774 F. App'x 824, 832 (5th Cir. 2019) (citing *EEOC v. Tex. Instruments Inc.*, 100 F.3d 1173, 1183 (5th Cir. 1996) ("This court has observed that an employer's disregard of its own hiring system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual.")).

Walton has pointed to no evidence in support of his claim that Tronox failed to promote him to the Capital Projects Leader position due to his race. He has pointed to no evidence that he applied for the position or that Tronox's decision to utilize a military-focused staffing agency was motived by discriminatory animus. Summary judgment is appropriate and hereby granted as to this claim.

C. *Reliability Leader*

Tronox concedes that Walton can establish a prima facie case as to its failure to promote him to the Reliability Leader position. Walton is black and therefore a member of a protected class. He applied for and was rejected from the Reliability Leader position. Tronox filled the position with Danny Roberts, who is white and outside of Walton's class.

Tronox has provided a legitimate, non-discriminatory reason for its hiring decision. *See McMullin v. Miss. Dept. of Public Safety*, 782 F.3d 251, 260 (5th Cir. 2015) (employer only needs to produce evidence of non-race-based reason for its employment decision). Tronox contends that Roberts was the best qualified candidate. Shane Foster, the Maintenance Manager in charge of hiring for this position, submitted a declaration that explains the hiring decision as follows:

> 2. The position of Maintenance Reliability Lead was vacant in early 2020. As the Maintenance Manager I was the hiring manager for this position. Tronox posted the position and there were multiple applicants, including but not limited to, Danny Roberts ("Roberts"), Steve Meyer ("Meyer"), Richard Schmidt ("Schmidt"), and Charles Walton ("Walton"). A diverse panel was assembled to assist with the interviews of the candidates. At the completion of the interviews, the panel selected Roberts as the best qualified candidate. I agreed and the position was offered to Roberts and he accepted the offer.
>
> 3. Roberts was far better qualified for the position of Maintenance Reliability Leader than was Walton. Roberts had worked as a Senior Reliability Engineer in Reliability at the Hamilton Plant for two years. Prior to coming to work for Tronox, Roberts had worked as a Senior Reliability Engineer for four years for Zachary in Houston, Texas. Prior to that, he had worked for Alcoa for five years as a Reliability Engineer and for Alloy Polymers for a year as Maintenance Manager. Before obtaining experience in Reliability Engineering, Roberts managed a furniture manufacturing plant for twelve years. Roberts had Bachelor Degrees in Business and Mechanical Engineering, and had done good quality work during his time in Reliability at the Hamilton Plant.
>
> 4. To the contrary, Walton's entire career at Tronox had been spent in Asset Improvement, and to my knowledge, he had no prior experience working in Reliability in another facility. It appeared that

most of his past experience had been in production. I also had some concerns about Walton's work performance based on my observations. He seemed to lack the level of knowledge you would expect from and [sic] engineer with his experience, and as a result, he often depended on others to assist him with tasks that he should have been able to complete on his own.

5. Walton was not even the second best candidate for the job. Meyer had two years or more of prior experience at the Hamilton Plant working as a Senior Reliability Engineer. Schmidt, who like Walton was in Asset Improvement, had previously worked as the Reliability Leader at the Hamilton Plant for several years, and prior to that, as a Reliability Engineer. therefore, even if the job had not been offered to Roberts, it would not have been offered to Walton.

[53], Ex. 9 at p. 1-2.

The burden now shifts back to Walton to demonstrate that Tronox's proffered reason for failing to promote him was a pretext for race discrimination. To do so, Walton must point to sufficient evidence to demonstrate that (1) the justification is false or unworthy of credence or (2) he was "clearly better qualified" than the person selected for the position. *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 412 (5th Cr. 2007).[9]

First, Walton appears to contend that Tronox's explanation is unworthy of credence. Specifically, Walton contends that he was not hired as Reliability Leader because he had no experience in reliability, yet he exclusively had experience in asset improvement and was not hired

---

[9] Importantly, Walton asserts that his failure-to-promote claims are subject to a mixed-motives analysis, which would require him to show that "the defendant's reason, while true, is only one of the reasons for its decision, and another 'motivating factor' is [his] protected characteristic." *Harstad v. City of Columbus, Miss.*, 2014 WL 4913966, at *3 (N.D. Miss. Sept. 30, 2014). On the contrary, the Supreme Court has somewhat recently held that a plaintiff bringing race discrimination claims under Section 1981 "must demonstrate that *but for* the defendant's unlawful conduct, [his] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass''n of African Am.-Owned Media*, --- U.S. ---, 140 S. Ct. 1009, 1015, 206 L. Ed. 2d 356 (2020) (emphasis added); *see also Williams v. Waste Mgmt., Inc.*, 818 F. App'x 315, 325 (5th Cir. 2020) ("42 U.S.C. § 1981 requires plaintiff's showing but-for causation"). Therefore, similar to the retaliation claim above, Walton must show that his race was the but-for cause of Tronox's employment decision, and he may do so producing substantial evidence of pretext. *January*, 74 F.4th at 654.

as AI Leader. He relatedly points out that Crowe was hired as AI Leader but had no previous asset improvement experience.

Tronox responds that this comparison is meritless. Tronox emphasizes that Walton did not apply for the AI Leader position, had no leadership experience, and had negative marks in a critical area on his most recent evaluation. Meanwhile, Crowe had leadership experience as Capital Projects Leader, Reliability Leader, and interim T&I Manager. As Capital Projects Leader, Crowe worked closely with the AI Unit, and as interim T&I Manager, Crowe managed the AI Unit. Therefore, Tronox contends that Crowe did have significant experience with asset improvement.

The Court agrees that Walton's argument lacks merit. Walton essentially argues that if Tronox truly promoted employees to unit leader positions based on their experience in that unit, it would have promoted him to AI Leader. Thus, says Walton, Tronox's rejection of him from the AI Leader position is evidence that it does not give preference to candidates with experience in a unit, and its explanation as to the Reliability Leader hiring decision is accordingly unworthy of credence. The problem with this argument is that Walton did not apply for the AI Leader position. Put simply, Walton cannot point to a "rejection" from the AI Leader position as evidence when no such rejection occurred. The Court rejects this argument as evidence of pretext.

Additionally, in support of his pretext argument, Walton asserts that he was better qualified for the position than Danny Roberts. A plaintiff may demonstrate pretext through proof that he was "clearly better qualified" for a position. *See Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir. 2002)). However, "[t]he 'clearly better qualified' test is a difficult one to meet." *Smith v. City of Tupelo, Miss.*, 2012 WL 777292, at *2 (N.D. Miss. Mar. 8, 2012); *see also Celestine v. Petroleos de Venezuela SA,* 266 F.3d 343, 357 (5th Cir. 2001). To demonstrate pretext, the "losing candidate's qualifications must leap from the record and cry to all who would listen that he was

37

vastly—or even clearly—more qualified." *Shater v. Shell Oil Co.*, 2022 WL 17250190, at *2 (5th Cir. Nov. 28, 2022) (quoting *Price*, 283 F.3d at 723). "The qualifications must be 'so widely disparate that no reasonable employer would have made the same decision.'" *Id*. (quoting *Martinez v. Tex. Workforce Comm'n—C.R. Div.*, 775 F.3d 685, 687 (5th Cir. 2014)). "Otherwise, 'any differences in qualifications are generally not probative evidence of discrimination.'" *Id*. (quoting *Moss*, 610 F.3d at 923).

Here, pointing to his own deposition testimony, Walton contends that he performed engineering functions that Roberts did not know how to perform when he was promoted to Reliability Leader. *See* [54], Ex. 1 at p. 54-55. Walton further asserts that he wrote the standards for the Reliability Department and that he had both mechanical and electrical aptitudes that Roberts lacked. *Id*. On the other hand, Tronox points to evidence that Walton had no experience as a reliability engineer and that his experience was primarily in production, while Roberts had 11 years of experience as a reliability engineer. Tronox also contends that Walton had issues with his work performance, while Roberts did not.

In cases where plaintiffs have presented evidence that they were similarly qualified for a position, the Fifth Circuit has nonetheless found that they were unable to satisfy the heavy burden of showing that they were "clearly better qualified." *See Price*, 283 F.3d at 723 (losing candidate's "better education, work experience, and longer tenure with the company" showed that he was a sufficiently qualified candidate but his qualifications did not "leap from the record" when contrasted with winning candidate's experience); *Mengistu v. Miss. Valley State Uni.*, 716 F. App'x 331, 335 (5th Cir. 2018) ("It is hardly self-evident that [the winning candidate's] finance degree and private sector experience make him less qualified than [the losing candidate's] economics degree and academic experience for a position in the *Department of Business*

*Administration*[.]") (emphasis in original); *Montgomery-Smith v. George*, 810 F. App'x 252, 263 (5th Cir. 2020) (where plaintiff had more education, supervisory experience, and longer tenure in department, court found that plaintiff was not "clearly better qualified" than winning candidate and that employers are entitled to give weight to other qualifications).

For example, in *Shater*, the plaintiff was denied a promotion to a regional security position at Shell Oil Company. 2022 WL 17250190, at *2. The plaintiff had "extensive international security experience in the private and public sector," and he had "a greater ability to obtain security clearances than [the winning candidate] based on his work with the secret service." *Id.* However, the position involved work in Latin America, and the winning candidate had "language skills and familiarity with the region [that] gave him a competitive advantage." *Id.* Therefore, notwithstanding the plaintiff's significant qualifications, the Fifth Circuit found that he had not established that he was "vastly—or even clearly—more qualified" for the position. *Id.*

Here, while Walton contends that he had certain aptitudes that Roberts did not have, his only evidence of that is the conclusory, self-serving statements he made at his deposition, which are not sufficient to create a question of fact as to whether he was clearly better qualified for the job than Roberts. *See Salazar v. Lubbock Cnty. Hosp. Dist.*, 982 F.3d 386, 389 (5th Cir. 2020) (plaintiff's self-serving statements that she was performing adequately were insufficient to create a triable issue of fact). Moreover, the record reflects that Walton may have provided electrical engineering support to the Reliability Unit or worked on projects with the Reliability Unit, which would have been expected in light of the fact that the AI Unit provided support to other units. However, Walton did not work exclusively in that unit or have significant experience with the reliability engineering specialty. Meanwhile, Roberts had 11 years of experience in reliability engineering specifically, with two years of experience in the Reliability Unit at Tronox. In light

of the fact that Roberts' experience was more tailored to the Reliability Leader position, Walton has simply not pointed to evidence that "leap[s] from the record" and demonstrates that "no reasonable employer would have made the same decision" to promote Roberts. *Shater*, 2022 WL 17250190, at *2. He has not created an issue of fact as to whether he was "clearly better for qualified" for the Reliability Leader position. Summary judgment is granted as to this claim.

D. *Business Improvement ("BI") Coordinator*

Tronox asserts that Walton's claim related its failure to promote him to the BI Coordinator position is time-barred by Section 1981's statute of limitations.

"Section 1981 does not contain a statute of limitations." *Belton v. GEO Group, Inc.*, 2021 WL 5832953, at *4 (5th Cir. Dec. 8, 2021). It was originally enacted as part of the Civil Rights Act of 1866, and at that time, it only protected against discrimination occurring during the formation of a contract. *Id.* However, Section 1981 was amended by the Civil Rights Act of 1991 to create a new cause of action for discriminatory and retaliatory conduct occurring after the formation of a contract. *Id.* (citing *Culbert v. Cleco Corp.*, 926 F. Supp. 2d 886, 891 (W.D. La. 2013)). "Thus, the applicable statute of limitations depends upon whether the claim was actionable under the original version of section 1981 or is only made by possible by the 1991 amendments." *Culbert*, 926 F. Supp. 2d at 891 (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)). If the claim was viable under the original enactment, the most analogous state statute of limitations period applies, which is three years in Mississippi. *Bridgeman v. Tracir Fin. Servs. I, Inc.*, 2016 WL 6953066, at *3 (S.D. Miss. Nov. 28, 2016). Where the claim is only available under Section 1981 as amended, the "catchall" four-year statute of limitations applies. *Belton*, 2021 WL 5832953, at *4.

"Failure to promote claims were actionable under section 1981, prior to the 1991 amendments, if 'the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer.'" *Culbert*, 926 F. Supp. 2d at 891 (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 179, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989)). "[W]here the promotion rises to the level of an opportunity for a new and distinct relation between the employee and employer," the claim would have been actionable prior to the 1991 amendments. *Id.* (quoting *Patterson*, 491 U.S. at 185, 109 S. Ct. 2363). "In deciding whether a change in position rises to the level of a new and distinct relation, the court must compare the employee's current duties, salary, and benefits with those incident to the new position." *Id.* (citing *Police Assoc. of New Orleans v. City of New Orleans*, 100 F.3d 1159, 1170-71 (5th Cir. 1996)). If the new position would result in "substantial changes," the failure to promote claim was available under the original enactment, and the three-year statute of limitations applies. *Id.*

Here, the BI Coordinator position was filled in May 2019. Walton filed his Complaint [1] on July 13, 2022. Assuming the position was filled on May 31, 2019, Walton's Complaint [1] was filed three years, one month, and 13 days later. Thus, if the promotion would have resulted in "substantial changes" to Walton's role and the three-year limitations period is applicable, Walton's claim related to the BI Coordinator position would be time-barred. If the promotion would not have resulted in "substantial changes," the four-year limitations period applies, and Walton's claim is timely.

Walton argues that he would not have had a claim under Section 1981 prior to the amendments because the promotion would have occurred after he already had a contract with Tronox. He asserts that "[t]he only question is whether the conduct arose after the formation of the original contract." [58] at p. 24. He cites no caselaw for this position, instead contending that the

district court cases cited by Tronox are "in error." *Id*. Tronox responds that "these district court decisions are well-rooted in U.S. Supreme Court and Fifth Circuit precedent." [65] at p. 9. The Court agrees with Tronox on this issue. The question before the Court is whether the promotion would have resulted in substantial changes—and therefore, a new and distinct relationship—to Walton's employment.

For its part, citing Worth's declaration, Tronox asserts that the promotion would have resulted in a new and distinct relationship for the following reasons:

> The positions carry different classifications with BI Coordinator classified as Grade 16/18 and AI Engineer at Grade 14/16. This difference equates to a materially higher salary for the BI Coordinator. The reporting structure is also different with the BI Coordinator reporting directly to the T&I Manager while there is an extra layer of management between the AI Engineer and the T&I Managers. Additionally, the positions have vastly different responsibilities with the BI Coordinator being responsible for managing Tronox's Operational Excellence program, overseeing site-wide cost improvement programs, tracking key performance indicators for various departments, identifying and implementing continuous business improvement initiatives, and participating in and supporting Tronox's Global Centers of Excellence teams. On the other hand, AI Engineers primarily focus on mid and long-range asset strategies and plans.

[54] at p. 27 (internal citations omitted).

Due to the higher salary and managerial duties associated with the BI Coordinator position, the Court finds that this promotion would have resulted in a new and distinct employee-employer relationship. *See Police Ass'n of New Orleans*, 100 F.3d at 1171 (finding "new and distinct relation" would result from promotion of police officer to sergeant due to higher salary, supervisory duties, and enhanced eligibility for further promotion); *Culbert*, 926 F. Supp at 892 (finding "substantial changes" would have resulted from promotion to new position that required higher level of technical skill and reclassification exam); *Lewis v. City of Shreveport*, 2018 WL

752362, at *9 (W.D. La. Feb. 7, 2018) (new title, supervisory duties, and salary that would require approval by City Council would result in "new contract" between employee and employer). While Walton presented argument on the applicable law, he has presented no evidence disputing that the promotion would have involved substantial changes to his pay and responsibilities. Therefore, the three-year statute of limitations applies, and Walton's failure-to-promote claim as to the BI Coordinator position is time-barred. Summary judgment is granted as to this claim.

*Conclusion*

For the reasons set forth above, Tronox's Motion for Summary Judgment [53] is GRANTED IN PART and DENIED IN PART. Walton's failure-to-promote claims brought pursuant to Title VII and Section 1981 are dismissed *with prejudice*. He will be permitted to proceed to trial on his retaliation claim.

SO ORDERED, this the 29th day of November, 2023.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE